# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned On Briefs September 5, 2012

# IN THE MATTER OF: ZAMORAH B.

**Appeal from the Juvenile Court for Davidson County**
**No. 2009641     Betty K. Adams Green, Judge**

---

**No. M2011-00864-COA-R3-JV - Filed February 15, 2013**

---

The Juvenile Court Referee named Mother as the child's primary residential parent and awarded visitation rights to Father. Mother requested a rehearing of the Referee's decision before the Juvenile Court Judge, alleging that "visitation was unfairly decided." Prior to the rehearing, the parties filed numerous petitions and motions related to visitation and custody, including requests for orders of protection and petitions for contempt. After a ten-day hearing, the Juvenile Court found that it was in the best interest of the child that Father be named her primary residential parent. Mother argues on appeal that the Juvenile Court should have applied the "material change of circumstances" standard to the evidence before it, and that, in any case, naming Father the primary residential parent was not in the child's best interest. We find, however, that the court was correct to decide the question of custody solely on the basis of the best interest of the child since this was not a modification action. Because the Mother has attempted to prevent Father from having any relationship whatsoever with his child, we also affirm the trial court's judgment naming Father as the primary residential parent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Patrick Johnson, Nashville, Tennessee, for the appellant, Terresa V. B.

Kevin D. C., Jackson, Tennessee, appellee, Pro Se.

## OPINION

### I. BACKGROUND

The child at the center of this case, Zamorah B., was born September 24, 2008, to unmarried parents, Terresa V. B. (Mother) and Kevin D. C. (Father). Father filed a petition in the Juvenile Court of Davidson County on January 23, 2009, captioned "Petition to Establish Paternity and for Custody of the Minor Child or in the Alternative to Establish Visitation." Father asserted that he had voluntarily supported the child and had emotionally bonded with her, but that Mother decided two months after the child's birth to eliminate him from her life. On January 29, 2009, Child Support Services filed a Petition on Mother's behalf to Establish Parentage and Set Child Support" naming Father as respondent.[1]

Father filed a Motion for temporary visitation and to consolidate the two petitions. The petitions were duly consolidated and a hearing was conducted before the Juvenile Court Referee on March 23, 2009. Mother appeared pro se, and Father was represented by counsel. After the hearing, the Referee filled out a standard form titled "Parentage Order" and filed it with the Juvenile Court Clerk. Mother's name was filled in on the line for the child's Primary Residential Parent and Father's name on the line for her Alternate Residential Parent.

The order also declared Father to be Zamorah's legal and biological father, and ordered that he was entitled to visitation with the child.[2] A box was checked next to the caption "see attached Visitation Order." However, no such visitation order is found in the record. Shortly thereafter, Mother filed a pro se motion and request for a rehearing before the Juvenile Court Judge, alleging that "visitation was unfairly decided." Before the rehearing could occur, the parties filed numerous petitions and motions related to questions of visitation and custody, including requests for orders of protection and petitions for contempt.[3]

We need not recite the details of all those filings, but we note that their substance indicates that Father was primarily attempting to exercise the visitation rights granted by the Juvenile Court Referee, while Mother was trying to prevent Father from exercising any

---

[1]The record includes a DNA test confirming Father's paternity.

[2]The Referee also ordered Father to pay child support of $484 per month in accordance with the income shares child support guidelines, together with an additional monthly amount to satisfy a support arrearage of $1,167.

[3]The record also contains a petition for temporary custody of Zamorah, filed by Mother's sister.

visitation with his child. In some of these filings, the parents made disturbing allegations about each other.

When Father succeeded in obtaining an order setting out a specific visitation schedule, the court's order generally included safeguards related to the place and manner of the transfer of the child between the parties. For example, on May 11, 2009, the Juvenile Court Referee granted Father visitation with Zamorah every other weekend and every Wednesday night, with exchange of the child to occur at a neutral location agreed upon by the parties. Both parties were also enjoined "from threatening, harassing, or intimidating the other party." The parties subsequently entered into an agreed order whereby all visitation exchanges were to occur at the Exchange Club of Nashville. Even that order did not lead to consistent peaceful exchanges of the child between the parties.

In an order filed October 23, 2009, the referee ordered that Father should have "extended visitation" with the child until further orders of the court. The referee also appointed a Guardian ad Litem for the child. Mother subsequently contacted DCS, told them that she was concerned for Zamorah's welfare and asked them to do a home inspection on Father's house. DCS did perform the home check. No concerns were raised and Father and child appeared to be bonding.

Shortly thereafter, CASA was asked to participate in this case.[4] A CASA volunteer and a CASA supervisor both testified at the final custody hearing that they tried to set up visitation for Mother after the filing of the order that gave Father extended visitation time, but that Mother refused their help, apparently objecting to the idea that her time with the child would constitute visitation rather than custody. Mother testified, however, that no one tried to arrange any such visitation. As a practical matter, therefore, Father became the child's sole caregiver after October 23, 2009, and there was no visitation by Mother.

After a March 3, 2010 hearing on a contempt petition, the Juvenile Court Judge established a visitation schedule for Mother. The court ordered that Mother's visitation would take place from Wednesday at 6:00 p.m. until Saturday at 2:00 p.m., "so long as there are not problems with the exchanges."[5] The court also imposed strict conditions on the manner of the exchanges and the conduct of the parties. The court stated that "[t]his will

---

[4]CASA is an acronym for **C**ourt **A**ppointed **S**pecial **A**dvocate for Children.

[5]The record shows that on December 2, 2010, the court suspended Mother's visitation (other than a limited visit on Christmas Day) after Mother prevented Zamorah from receiving a court-ordered and doctor-recommended flu shot.

allow both parties the opportunity to show the Court that they can cooperate with one another for their child's benefit."[6]

## II. PROCEEDINGS BEFORE THE JUVENILE COURT JUDGE

The final custody hearing was conducted before the Juvenile Court Judge over ten separate days, beginning on March 3, 2010 and ending on August 25, 2010. The court announced at the outset that the proceeding was meant to be an initial custody determination, despite the March 23, 2009 order referring to Mother as the "Primary Residential Parent." Mother's attorney objected, contending that the earlier order was an initial custody determination and that, therefore, the current proceeding was one for a modification of an existing custody order, so the court had to follow the procedures that apply to such a proceeding. The court overruled the objection.

Sixteen witnesses testified during the hearing, in addition to Father and Mother and their family members. At the conclusion of proof and of closing arguments, the court took the matter under advisement, pending further review of the voluminous record that had been produced in the course of the proceedings between the parties. The court also ordered that Mother's visitation with Zamorah continue during the interim.

On April 12, 2011, the trial court filed a forty-page final custody order, which summarized the history of the case in detail, including testimony by Mother and her family members which the court declared not to be credible. The court stated that its decision would be an initial custody determination, and that its ruling was based on a "best interest of the child" analysis under the factors set out at Tenn. Code Ann. § 36-6-106(a). It also declared, however, that its findings were sufficient to prove that there had been a material change of circumstance such as would justify a modification of an existing custody order.

## III. THE CORRECT STANDARD

Mother first argues that the trial court applied an incorrect legal standard. The proper standard to be used by a trial court is a question of law, which we must review without according any presumption of correctness to the trial court's determination of that question. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002); *Placencia v. Placencia,* 48 S.W.3d 732, 734 (Tenn. Ct. App. 2000).

---

[6]The court cautioned both parties that no family members were allowed to be in the building, no pictures of the child were to be taken, no physical examination was to take place at the exchange location, and no cursing or disparaging remarks about either parent by the other was to occur in the presence of Zamorah.

When the trial court is called upon to make an initial custody determination, or parenting arrangement, between two parents who are vying for the custody of their child, the court must make its decision on the basis of the child's best interest. Tenn. Code Ann. § 36-6-106(a).[7] However, when a parent seeks a modification of a court's "prior decree of custody," the court must first determine whether a material change of circumstances that affects the well-being of the child has occurred. T.C.A. § 36-6-101(a)(2)(B); *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). Only after the court has made the threshold determination that such a change of circumstances has occurred may it consider whether a change of custody is in the best interest of the child or children involved.

On appeal Mother argues that the trial court erred by determining that the proceeding before it was for an initial custody order and that the court, therefore, mistakenly based its decision solely on the basis of the child's best interest. She contends, rather, that the March 23, 2009 Parentage Order entered by the Referee was the initial custody order and, thus, that the Juvenile Court Judge was not entitled to even consider the best interest of the child until it had first made the threshold determination that a material change of circumstances had occurred. We disagree.

This action was brought to establish parentage and to set a custody and visitation arrangement. Both parents sought custody. It was originally heard by a Referee, pursuant to Tenn. Code Ann. § 37–1–107(a) and Tenn. R. Juv. P. 2(17).[8] The ultimate status of an order rendered by a referee depends on the subsequent history of that order. The relevant statute provides:

> (d) Upon the conclusion of the hearing in each case, the magistrate [referee] shall transmit to the judge all papers relating to the case, together with the magistrate's [referee's] findings and recommendations in writing. . . .
>
> (e) Any party may, within 5 (five) days thereafter, excluding nonjudicial days, file a request with the court for a hearing by the judge of the juvenile court. The judge may, on the judge's own motion, order a rehearing of any matter heard before a magistrate, and shall allow a hearing if a request for such

---

[7] The parenting plan statute, Tenn. Code Ann. § 36-6-404, requires a permanent parenting plan only in actions for divorce, legal separation, annulment, or separate maintenance.

[8] The Tennessee Rules of Juvenile Procedure define a "Referee" as "a person meeting the qualifications and serving the functions set forth in Tenn. Code Ann. § 37-1-107." Tenn. R. Juv. P. 2(17). Within the Juvenile Court, the terms "Referee" and "Magistrate" are therefore synonymous, and both have been used in this case to refer to the same individual acting in his official capacity.

hearing is filed as herein prescribed. Unless the judge orders otherwise, the recommendation of the magistrate shall be the decree of the court pending a rehearing.

(f) In case no hearing before the judge is requested, or when the right to a hearing is waived, the findings and recommendations of the magistrate become the decree of the court when confirmed by an order of the judge. The final order of the court is, in any event, proof of such confirmation, and also of the fact that the matter was duly referred to the magistrate. . . .

Tenn. Code Ann. § 37-1-107; *See also* Tenn. R. Juv. P. 4(a).

Thus, when a party seeks review by the Juvenile Court Judge of a referee's decision, the referee's report and findings, including any order reflecting such findings, remain only a recommendation. Tenn. Code Ann. § 37-1-107(e); Tenn. R. Juv. P. 4(c); *Kelly v. Evans*, 43 S.W.3d 514, 515 (Tenn. Ct. App. 2000).

Review of a magistrate's decision in a juvenile case is accomplished through a *de novo* hearing before the judge. *Kelly v. Evans*, 43 S.W.3d at 515. The *de novo* hearing is not a review of the record presented to the magistrate, but is a full evidentiary hearing akin to a new trial, as in an appeal from a general sessions court to a circuit court. *Kelly*, 43 S.W.3d at 515; *see also Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006) (no Tenn. R. App. P. 11 application filed) (judgment of the juvenile court vacated and remanded for a *de novo* trial because the juvenile court judge reviewed the referee's decision without a hearing or the presentation of any evidence). Accordingly, in a *de novo* hearing, the juvenile court judge must decide the issues without regard to the actions of the Referee.

In the present case, Mother sought review of the Referee's decision. On appeal she argues that the Parentage Order entered March 23, 2009, by the Referee which named Mother as the Primary Residential Parent is a previous decree awarding custody, as she describes the requirement for a modification proceeding discussed in *Hoalcraft v. Smithson*, 19 S.W.3d 822, 829 (Tenn. Ct. App. 1999).

This argument overlooks several modifications that were made to the custody and visitation arrangement between the entry of the March 23, 2009, order and the Juvenile Court's rehearing of the matter. All such orders were merely interim orders, and Mother does not base her argument on any of those orders. The proceeding before the Juvenile Court Judge was simply a continuation of the case on the original petitions. It was not a new action.

Finally, as set out above, the Referee's Parentage Order remained a recommendation because Mother sought review by the Judge. It never became an order of the court.[9] The Referee's order was certainly not a "prior decree of a court" as that term is used in the modification of custody statute. Accordingly, the Juvenile Court properly ruled that the proceeding before it was one to establish an initial custody order and that the proper standard of decision was the child's best interest.

## IV. BEST INTEREST OF CHILD

Applying the best interest of the child standard, the trial court designated Father as the child's primary residential parent and Mother as her alternate residential parent. Mother was awarded two hours of supervised parenting time each week at the Juvenile Justice Center in Jackson, Tennessee with visitation to be supervised by CASA in Madison County "as long as CASA is willing to supervise."[10]

In its best interest analysis, the court carefully considered the relevant factors set out in Tenn. Code Ann. § 36-6-106(a).[11] The court entered a forty page order reflecting its

---

[9]If no review by *de novo* hearing before the judge is requested "the findings and recommendations of the magistrate become the decree of the court when confirmed by an order of the judge." Tenn. Code Ann. § 37-1-107(f); *In re Bridges*, 63 S.W.3d 346, 347 (Tenn. Ct. App. 2001).

[10]The court stated that it would consider modifying visitation if Mother complied with the rules of visitation, refrained from violating prior court orders about speaking negatively about Father in the presence of the child, and followed the recommendations of counselors. The court also recommended that Mother receive anger management and parent education training as was suggested by a social worker.

[11]Tenn. Code Ann. 36-6-106(a) directs the courts to "consider all relevant factors, including the following, where applicable:"
(1) The love, affection and emotional ties existing between the parents or caregivers and the child;
(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .
(4) The stability of the family unit of the parents or caregivers;
(5) The mental and physical health of the parents or caregivers;
(6) The home, school and community record of the child;
(7) The reasonable preference of the child, if twelve (12) years of age or older;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;
(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and
(10) Each parent's or caregiver's past and potential for future performance of parenting
(continued...)

consideration of those factors, reviewing the history of the case, setting out the evidence and the findings therefrom, and determining that the testimony of Mother and her family was not credible on many issues.

Child custody cases are reviewed *de novo* on the record of the trial court. Our review of the trial court's findings of fact is accompanied by a presumption of correctness, unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). Further, the trial courts have been given broad discretion given in matters of child custody and visitation, and appellate courts are reluctant to second-guess a trial court's determination in those matters. *Parker v. Parker,* 986 S.W.2d 557, 563 (Tenn. 1999); *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App. 1997). However, the trial court's conclusions of law are not entitled to a presumption of correctness on appeal. *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Wiser v. Wiser*, 339 S.W.3d 1, 11 (Tenn. Ct. App. 2010).

The trial court applied each of the statutory best interest factors and found that some did not indicate custody with one parent over the other was in the best interest of the child. The court found that other factors favored Father as the primary residential parent. For example, the court found that "both parents love their child and said love and affection is reciprocated by the child as testified by several witnesses," Tenn. Code Ann. § 36-6-106(a)(1). However, "the stability of the family unit of the parents" favored Father because Mother's financial stability was in question and the court was unsure "how the mother's current criminal legal issues might affect the mother's stability." Tenn. Code Ann. § 36-6-106(a)(4).

The decisive factor for the trial court, however, was "[e]ach parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child." Tenn. Code Ann. § 36–6–106(a)(10). The court set out its reasoning as follows:

_____

[11](...continued)
responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

No proof has been presented that either parent lacks the ability to perform day-to-day parenting tasks. However, this factor goes overwhelmingly in favor of the father. After being before the court on numerous occasions, the mother has repeatedly refused to abide by the Court's order regarding derogatory remarks about the father in the presence of the minor child, visitation, and medical issues. On April 2, 2010, the Court emphasized "to both parties the impact their inability to co-parent effectively has on Zamorah and to a custody determination." However, the mother has continuously allowed her feelings about the father to control her behavior despite numerous Court Orders. Furthermore, the Court previously ruled that the mother was in contempt for withholding visitation on at least one occasion, although there was testimony regarding more incidents. This has led to the parents' inability to effectively co-parent for the benefit of the minor child. The mother has proved that she is completely unwilling to promote, encourage or facilitate a close and continuing parent-child relationship between the child and her father. The father has testified, however that he encourages a relationship between the mother and child by speaking to the child positively about the mother, soothing her when the child cries for the mother, buying the mother a mother's day card, and offering and driving the minor child to Nashville, TN for Christmas day 2010 visitation with the mother and child. This is a deciding factor in this case, and the court finds that the father is definitely the more satisfactory parent as it pertains to this factor.

The willingness of a parent to facilitate and encourage a close relationship between the child and the other parent is an important factor for the courts to consider in custody cases. Indeed, our legislature has stated that "the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." Tenn. Code Ann. § 36-6-401(a).

Our case law is accordingly replete with examples where the greater willingness of one parent to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent has been the decisive factor in determining parenting arrangements. *In re Jonathan S. C-B,* M2010-02536-COA-R3-JV, 2012 WL 3112897 (Tenn. Ct. App. July 31, 2012) (petition to rehear denied Aug. 20, 2012) (no Tenn. R. App. P. 11 application filed); *Howe v. Howe*, E2008-02580-COA-R3-CV, 2010 WL 323068 (Tenn. Ct. App. Jan. 28, 2010) (Rule 11 perm. app. denied August 25, 2010); *Morman v. Morman*, M2005-00931-COA-R3-CV, 2006 WL 2068757 (Tenn. Ct. App. July 25, 2006) (no Tenn. R. App. P. 11 application filed).

Consequently, the question becomes whether the evidence in the record preponderates against the trial court's findings of fact on this and other factors relevant to the designation of a primary residential parent. Having carefully reviewed the record, we conclude that the evidence fully supports the trial court's findings and also its conclusion regarding the parents' relative willingness to promote a good relationship between the child and the other parent. We see no need to recount all the evidence, but a few examples demonstrate the correctness of the trial court's findings and conclusion.

Starting in 2007, Father worked for two years for a company called BIOS, caring for an autistic adult, and he did similar work at New Horizons. After Zamorah was born, Father took an eight week parenting course, and a certificate of completion was admitted into the record. At the time of the hearing, he was working as a teacher in Jackson, Tennessee for the Madison County Public School System.

Mother was in college for two years studying criminal justice and, except for a few months around the birth of her child, she was continuously employed as an unarmed security guard for Guardsmark Security. She was a conscientious and trustworthy employee.

Father was present in the hospital for Zamorah's birth, and he testified that he gave Mother $200 every two weeks in the first few months of the baby's life to help with her expenses. Bank statements entered into the record confirm Father's testimony about his contributions of support.

Father described his attempts to exercise the specific visitation rights that the Juvenile Court Referee finally granted him. The first exchange of the baby for visitation was scheduled to take place at Night Court on May 2, 2009. Father testified that Mother appeared over an hour late and that when she arrived she removed the blanket that was covering the baby's face so Father could see her, and then walked off without allowing him to have any contact with the baby.

Father described several other incidents whereby Mother prevented him from exercising court-ordered or mutually agreed-upon visitation, and others where she yelled at him and cursed him in the presence of the child.

When Mother took the stand, she denied the truth of many of Father's assertions. She explained that she did not allow Father to exercise court-ordered visitation on May 2, 2009 because he did not know how to care for a child. She stated that the transfers at the Exchange Club all went smoothly except for one time. She acknowledged that on that occasion she became angry at the Exchange Club personnel and that she yelled at them when she went to pick up the child because they did not give her the child when she asked for her,

-10-

and because they were talking about her behind her back. She also denied speeding in the Exchange Club parking lot, or that she had ever said anything derogatory about Father in the presence of the child. Mother denied that Father cared anything about Zamorah, and she insisted that Father was just using visitation as a way of getting back at her.

The hearing also included testimony offered by several individuals who, as part of their professional duties, had contact with the parents or the child, or with both. Those witnesses who observed transfers of the child for visitation between Mother and Father consistently testified to hostile and disrespectful conduct by Mother towards Father and said that Father did not retaliate in kind. Testimony by other witnesses included several accounts of Mother's failure to even show up at the Exchange Club for Father's court-ordered visitation.

Ms. LeQuire, who kept records regarding exchanges at the Exchange Club, documented a number of different incidents wherein Mother used profane language at the Exchange Club, violated the agreed-upon rules, screamed and demanded her child, snatched the child out of a supervisor's arms, called the supervisor a profane name under her breath, stormed out of the building, and sped out of the parking lot, putting herself, the child, and others at risk. During the exchanges, Father was affectionate and gentle with the child. Mother was banned from the Exchange Club, and the court subsequently ordered her mother to take her place during exchanges.

The record also includes home studies and parenting assessments of both Father and Mother by Tonya Hobbs, M.S.W., a licensed social worker. Ms. Hobbs reported that Mother and Father both have clean and well-maintained homes and that both love their daughter and are committed to her. She nonetheless observed that Mother has demonstrated rigid thinking, poor anger management, and aggressive behavior towards Father.

Ms. Hobbs concluded that it was essential to Zamorah's well-being that her parents develop a respectful and cooperative co-parenting arrangement, but that Father was fearful and overwhelmed by the level of conflict between himself and Mother. She recommended that Mother go for anger management training, parent education, mediation and further psychological evaluation. She noted that Father has attended parenting training but that Mother has not.

Tameki Marks, who works as a volunteer for CASA, was able to observe Zamorah in the homes of both Mother and Father. She found that the child seemed happy and comfortable in both places. She noted, however, that there was some conduct by Mother and her sister, both during and after receiving the child from Father, that was cause for concern. She observed both Mother and her sister yelling at Father and making negative comments

-11-

about him in the child's presence. She also stated that she never heard Father say anything negative about Mother.

The trial court found in this case that, "[t]he mother has proved that she is completely unwilling to promote, encourage or facilitate a close and continuing parent-child relationship between the child and her father." We agree. The evidence also showed that Father was a loving, caring parent, and that he was willing to promote and encourage Zamorah's relationship with Mother for the sake of the child.

In sum, we have carefully reviewed the record, and we find that the evidence does not preponderate against the trial court's finding as to Mother's unwillingness to include Father in Zamorah's life or the effect that unwillingness should have on the question of custody. Nor does the evidence preponderate against the trial court's findings as to the other factors set out in Tenn. Code Ann. § 36-6-106(a). We accordingly affirm the order of the trial court.

## V.

The order of the trial court is affirmed. We remand this case to the Juvenile Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Teressa B.

_____
PATRICIA J. COTTRELL, JUDGE